Alan Bakowski (Ga. Bar No. 373002)
Hans Clausen (Ga. Bar No. 153250)
Christopher Gleason (Ga. Bar No. 105493)
Federal Trade Commission
401 W. Peachtree Street, NW, Suite 1500
Atlanta, Georgia 30308
(404) 656-1363; abakowski@ftc.gov
(404) 656-1361; hclausen@ftc.gov
(404) 656-1352; cgleason@ftc.gov

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MAPLEBEAR INC., a corporation, d/b/a<br><br>INSTACART,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.     The FTC brings this action for Defendant's violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

## SUMMARY OF THE CASE

2.     Defendant Maplebear Inc., doing business as Instacart ("Instacart"), is one the nation's leading providers of grocery delivery services. Instacart allows consumers to shop for groceries on its website or mobile apps and have them delivered to their homes or made available for

1  in-store pickup. In 2024 alone, consumers placed 294 million orders and spent $33.5 billion on

2  Instacart's platforms.

3    3.    To entice consumers to try out its grocery delivery service, Instacart routinely offers

4  "free delivery" to consumers on their first order. However, Instacart's claims of "free delivery" are

5  false because consumers still have to pay fees to get their groceries delivered. Mandatory "service

6  fees"—**which are not charged on pickup orders** and which add at least 7.5%-15% to the order

7  cost—are hidden from consumers until checkout and are just delivery fees by another name. Many

8  consumers have complained about Instacart's deceptive offer, and Instacart's own research found

9  that consumers "**felt the free first delivery offer was a bait-and-switch** as they are still charged a

10 service fee," recognizing that consumers "don't differentiate" between "delivery" and "service" fees.

11 Consumers have paid Instacart tens of millions of dollars in service fees and other mandatory fees on

12 their first "free delivery" orders.

13    4.    Instacart also frequently advertises that it has a "100% satisfaction guarantee,"

14 implying that Instacart will provide full refunds when consumers are not fully satisfied. But in many

15 instances, this promise is illusory. Consumers who experience late deliveries or unprofessional

16 service typically are not offered full refunds and instead are given only a small credit that can be

17 used toward a future order. Additionally, Instacart has hidden the refund option from the "self-

18 service" menu that consumers use to report problems with their orders, leading many consumers to

19 erroneously believe they can receive only a credit toward a future order rather than a refund. This

20 harms consumers who prefer refunds, especially those who do not want to use Instacart again.

21 Instacart has pocketed tens of millions of dollars by failing to honor its promise of 100% consumer

22 satisfaction.

23    5.    Instacart's membership program, Instacart+ (formerly known as Instacart Express),

24 advertises certain additional benefits to consumers, such as $0 delivery fees on orders above a

25 certain amount. Most consumers join Instacart+ through 14-day free trials. But Instacart does not

26 clearly and conspicuously disclose that these 14-day free trials automatically renew into paid annual

27 subscriptions (typically priced at $99 per year) and that consumers will therefore be enrolled in and

28 charged for a paid subscription at the end of their free trial. Nor does Instacart clearly and

conspicuously disclose that it refunds Instacart+ membership fees only under limited circumstances, instead misleadingly telling consumers they can "cancel anytime." As a result, Instacart has charged many consumers for paid memberships without their express informed consent, and hundreds of thousands of consumers have been charged membership fees without receiving benefits from the membership or getting refunds.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## DIVISIONAL ASSIGNMENT

8.      Assignment to the San Francisco Division is proper because at all relevant times Defendant has conducted business, marketed, and sold its services throughout the United States, including throughout the county of San Francisco.

## PLAINTIFF

9.      The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-05, which, among other things, prohibits the sale of goods or services on the Internet through negative option marketing without satisfying certain requirements to protect consumers. A negative option is an offer in which the seller treats the consumer's silence—their failure to reject an offer or cancel an agreement—as consent to be charged for goods or services. 16 C.F.R. § 310.2(w).

## DEFENDANT

10.     Defendant Maplebear Inc., doing business as Instacart, is a Delaware corporation with its principal place of business at 50 Beale Street, Suite 600, San Francisco, California 94105. Instacart transacts or has transacted business in this District and throughout the United States.

**COMMERCE**

11.     At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANT'S BUSINESS ACTIVITIES**

12.     Founded in 2012, Instacart describes itself as "the leading grocery technology company in North America" and claims to "deliver the best consumer online grocery experience anywhere." Partnering with over 1,400 national, regional, and local retailers representing over 85% of the U.S. grocery industry, Instacart offers consumers on-demand delivery from grocery stores via its online shopping platform, known as the Instacart Marketplace.

13.     Consumers access the Instacart Marketplace by visiting Instacart's website or using Instacart's mobile applications. After creating an account, consumers can choose a retailer, browse items available for sale, and add items they want to their shopping cart. Before completing their first order, consumers must provide their payment information, such as credit or debit card or other financial account information. After a consumer places an order, Instacart assigns a "shopper" to purchase the items from a physical store and deliver them to the consumer's location (or, if the consumer prefers, make them available for in-store pickup).

**Instacart Falsely Promises Consumers Free Delivery**

**Instacart Prominently Advertises "Free Delivery" on Consumers' First Orders**

14.     Instacart frequently advertises that consumers can get "free delivery" on their first order on the Instacart Marketplace. Often, Instacart offers a promotion for "free delivery" on a consumer's first three orders (which Instacart refers to as its "3 Free Delivery" promotion).

15.     Figure 1 below shows one example of an advertisement in which Instacart promised "free delivery."

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF

1    **Figure 1.**



16.    Figure 2 below shows another example of how Instacart advertised "free delivery."

**Figure 2.**



17.    Figure 3 below shows an example of a "free delivery" promotion shown in a pop-up window from the Instacart homepage.

1    **Figure 3.**



13    18.    And Figure 4 below shows an example of how Instacart displayed its "free delivery"

14    promotion on a banner at the bottom of Instacart's website.

15    **Figure 4.**

16    
17    

18    19.    Instacart offers these promotions because it wants to attract new customers, many of

19    whom are hesitant to place orders with Instacart due to concerns about the cost or quality of

20    Instacart's services. Instacart knows that "free delivery" is a powerful message that helps persuade

21    consumers to place orders on its platform. Reasonable consumers understand Instacart's promise of

22    "free delivery" to mean that they will not have to pay any fees to Instacart when they place a

23    delivery order.

24    **Instacart Charges Mandatory Fees on "Free Delivery" Orders**

25    20.    Instacart's promises of "free delivery" are false because consumers cannot get their

26    groceries delivered without paying fees that Instacart only charges on delivery orders.

27    21.    Instacart charges fees on every delivery order placed on the Instacart Marketplace. By

28    default, every delivery order includes both a "delivery fee" and a "service fee." Although Instacart

6

charges these fees separately, both the delivery fee and the service fee are, in fact, related to delivery, and Instacart uses both fees to offset costs relating to the delivery of goods to consumers.

22.    When Instacart advertises "free delivery" on an order, it actually means that the "delivery fee" on that order will be $0. But Instacart still charges at least one other mandatory fee, the service fee—and in some cases, additional mandatory fees such as "regulatory response fees"—on *every* delivery order, including those advertised as "free delivery." Instacart does not charge service fees on pickup orders. Instacart's claim that delivery is "free" is therefore false because consumers must pay mandatory fees on *every* delivery order, including delivery orders that are purportedly eligible for "free delivery."

23.    During most of the relevant time period, Instacart failed to adequately disclose to consumers that they must pay fees on orders with "free delivery." In many instances, Instacart provided only an inconspicuous disclaimer that "terms apply," sometimes with a link to a separate page on Instacart's website containing the terms applicable to Instacart's "free delivery" promotions. Those terms include a single sentence in the middle of a lengthy paragraph stating, "Service fees, special handling fees, and/or taxes may still apply." These disclaimers are inadequate to cure the false impression created by Instacart's promise of "free delivery."

24.    Instacart typically does not disclose the fees that actually apply to an order until consumers reach the checkout screen. As a result, many consumers who are promised "free delivery" on their first order do not realize that they will be charged a service fee (and other applicable fees) until after they have spent significant time creating an Instacart account, choosing a retailer, searching the items listed for sale, adding items to their shopping carts, and then advancing to the checkout screen. Research conducted by Instacart found that consumers spent approximately 36 minutes on average putting together their first order before reaching checkout.

25.    Even once Instacart discloses the mandatory service fee at checkout, Instacart still does not disclose to consumers that—just like the "delivery fee"—the service fee is charged *only on* delivery orders.

**Consumers Are Deceived by Instacart's "Free Delivery" Promises**

26.     Many consumers have complained that Instacart charged a service fee at checkout after promising "free delivery." For example:

    a.   "I assumed FREE delivery meant completely free of fees."

    b.   "Instacart advertised free delivery on your first 3 orders and now accepting EBT. I have sick kids home today so I thought I would take advantage of that. So I spent an hour finding everything I need. Then when I get to the check out they try to charge me a $15 service fee. They should inform you of the service fee before you spend an hour shopping thinking it's gonna be a free [sic]. False advertising at its finest."

    c.   "The fee structure is not upfront before placing an order. If there's a service fee [and] a delivery fee which are 2 separate things outside of the tip, that should be made transparent BEFORE check out."

    d.   "Instacart advertises 'first three deliveries free,' but charges a $7 'service fee' which means the delivery isn't free . . . promising three free deliveries and charging that is deceptive at best, and an outright lie or fraud at worst."

    e.   "[I]nstacart . . . was giving promotions stating that I had free delivery and it was free free free . . . they do not state that there is a service fee until you have reached checkout and for some of us it takes [an] hour or hours to place our grocery order not everybody is computer savvy this is not just a small fee it was over 10% service fee so I recommend that it be required up front before a person spends their time shopping and then come to find out they can't have their groceries like they thought they were going to get . . . ."

    f.   "And finally, how is it 'free delivery' when they charge you a service fee?"

27.     Instacart is aware that many consumers are deceived by its "free delivery" promises. For example, an internal research report from November 2021 noted that some consumers "**felt the free first delivery offer was a bait-and-switch** as they are still charged a service fee" (bold in original), highlighting one consumer who said, "Don't say the first order is free if you're going to

charge the service fee." The author of that report later commented on an internal presentation about consumer preferences, writing: "Typically when consumers refer to free delivery, they mean both delivery and service fee, they don't differentiate these the same way we do internally." And an internal report from November 2023 found that "new users feel the final cost at checkout is unexpected" and that "they questioned . . . [w]hy they are getting charged fees if we say they get 'free delivery.'"

28.     Instacart's research also has found that many consumers do not understand why Instacart charges service fees in addition to delivery fees. For example:

    a.     An internal report from June 2022 concluded, "Consumers don't understand separate service and delivery fees, especially IC+ members and orders that qualify for free delivery. Consumers are not aware of all the potential fees that may apply before they check out."

    b.     An Instacart researcher wrote in June 2023, "[a]lthough service fees is one of the primary fees for each Instacart order, customers rate it lower on clarity at checkout and in general." The researcher recommended that Instacart "[c]onsider renaming the fee for clarity as 'service' and 'delivery' can be synonymous for some customers (i.e., Walmart combines all fees and label it as 'delivery from the store')."

    c.     A report from November 2022 found that consumers who are new to Instacart "need more information about fees to feel like they know what to expect with regards to cost on Instacart." The same report highlighted this comment from a consumer: "I understand the delivery fee. I wonder why there is an additional service fee. Like, what does that even mean? Why is it not simply folded into the delivery fee?"

29.     Rather than truthfully advertising the cost of its delivery services, Instacart forced consumers to invest their valuable time and energy—in many cases exceeding 30 minutes—so that it could coerce them into paying hidden fees. Whether or not consumers capitulate and agree to pay these fees to get their groceries delivered, they are harmed by Instacart's deception.

**Instacart Misleads Consumers with Its "100% Satisfaction Guarantee"**

**Instacart Promises to Guarantee Consumers' Satisfaction**

30.    Since at least 2022, Instacart has frequently advertised that orders placed on the Instacart Marketplace are protected by a "100% satisfaction guarantee." Instacart prominently displays this message to make consumers feel more comfortable placing orders on the platform, especially new users who may have concerns about the quality of Instacart's delivery services. Indeed, experiments conducted by Instacart showed that displaying this message increased the number of consumers who placed orders on the platform.

31.    Instacart often displays the phrase "100% satisfaction guarantee" while consumers are filling their shopping carts and placing their orders. For example, Instacart typically displays the "100% satisfaction guarantee" just below the name of the retailer on the main shopping page, as in Figure 5 below.

**Figure 5.**



32.    Instacart typically also displays the phrase "100% satisfaction guarantee" when consumers look at their shopping cart and/or when they are on the checkout page. (*See* Figure 6.)

**Figure 6.**



33.    In many instances, Instacart advertises the guarantee with the additional phrase, "Place your order with peace of mind." (*See* Figure 7.)

**Figure 7.**

34.    To many consumers, these messages convey the impression that they can get a full refund from Instacart if they are not 100% satisfied with their order. For example, Instacart noted in an internal report in 2022 that consumers say they expect a refund or credit for the full amount of their order when an order is late.

**Instacart Fails to Honor Its Guarantee**

35.    Instacart's 100% satisfaction guarantee does not actually guarantee consumers a full refund if they are not 100% satisfied. In fact, in many circumstances Instacart does not offer full refunds to dissatisfied consumers.

36.    For example, in situations where a consumer's order is delivered late (i.e., outside the selected delivery window), Instacart typically offers the consumer an "appeasement" in the form of a credit toward a future order. The amount of this credit varies, but it is almost always less than the full cost of the consumer's late-delivered order. The written terms of Instacart's 100% satisfaction guarantee provide that in these "late arrival" circumstances, "[c]ustomers are eligible for a refund or credit towards a future order of up to the total amount of any fees paid by the customer for the order." In other words, the 100% satisfaction guarantee applies only to the fees paid on the order, not the full cost of the order. This same limitation applies to consumers who experience "unprofessional service"—situations where "the individual(s) responsible for shopping for the items and/or delivering the items engage in inappropriate conduct during the shopping or delivery process."

37.    The written terms of Instacart's 100% satisfaction guarantee also provide that "Instacart shall have the sole discretion to," among other things, "[d]ecide whether to issue a refund or a credit towards a future order" and "[d]etermine the amount of such refund or credit."

38.    Instacart does not disclose, or does not disclose adequately, the limitations on its 100% satisfaction guarantee. The full written terms of Instacart's 100% satisfaction guarantee are displayed on a separate page of Instacart's website that consumers are not required to view before making purchases. Instacart sometimes displays the "100% satisfaction guarantee" language with a hyperlink to the full terms page, but in many instances, consumers may not realize there is a hyperlink or that there are additional terms located on the hyperlinked page because of the manner in which it is displayed.

39.    In some instances, Instacart displays a "tooltip" icon next to the guarantee that opens a pop-up window with additional information about the guarantee when the icon is clicked on or tapped. Among other things, this pop-up window tells consumers that they are eligible for a refund

or credit if they experience a late arrival or unprofessional service, without mentioning that a refund may be limited to the amount of fees paid on the order. (*See* Figure 8.)

**Figure 8.**



40.     These disclosures on Instacart's website are inadequate to cure the false impression that consumers can get a full refund if that is necessary to make them 100% satisfied with their order.

**Instacart Deceives Consumers by Hiding Refund Options from Its Self-Service Reporting Tool**

41.     Instacart's website and mobile apps contain a self-service interface that consumers can use to report problems with their orders without having to contact customer service.

42.     Until sometime in 2022, Instacart's self-service reporting tool typically gave consumers a choice of receiving either a refund to their payment method or a credit toward a future order when they had missing or damaged items in their order. But in 2022, Instacart conducted an experiment (which it called "hide_refund") to hide the refund option from this interface to see if it could shift more consumers toward credits.

43.    As explained in an internal Instacart email:

*Problem or Question:* When reporting an issue via the self-service order issue flow, a customer can choose between either a refund to their original payment method or an Instacart store credit. Selecting the credit option is correlated with a higher [28-day] reorder rate, and customers who receive a refund without returning to Instacart are costly. We wanted to test whether we could reduce appeasement costs while encouraging customers to place an additional order by emphasizing the credit option.

*Solution or Answer:* On Android / iOS / Web on Marketplace, we tested removing the refund option (money back to the customer's payment method) from the self-service order issue flow. We added an entry point to contacting Care [customer service], where customers can still chat/call with a Care agent to receive a refund to their original payment method for their order issue. We also tested a variant (credit_first) that emphasized the credit option in the UI [user interface] without removing [the refund option] entirely.

44.    This experiment led many consumers to complain that they wanted a refund instead of a credit, suggesting they were unaware that refunds were still available by contacting customer service:

     a.    "I want a refund, not a credit. It's still taking my money for an item I didn't receive. Plus I'm not planning on using [Instacart] again because of this experience."

     b.    "I should've had the opportunity to credit my debit card for the three missing items (which I had to go to the store to buy after all…defeating the whole purpose of this service)."

     c.    "I'd rather I get refunded rather than a credit for 1 bag of organic fuji apples that I ordered but the shopper did not buy . . . . I want a refund for those to my account instead of the credit. Can you do that please?"

     d.    "I was to get a refund to my form of payment. Not a credit."

     e.    "I would rather be refunded for the two bad items than be credited, as I am not sure I will use Instacart again after my experience."

     f.    "I should not receive a credit instead of refund for items I was charged for and did not receive."

     g.    "I would have preferred a refund to my bank account rather than an Instacart credit but this will do. If it happens again I'll expect something different."

14    COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF

45.    Instacart recognized that "customers are frustrated by the lack of a refund option." One Instacart employee, who apparently was unaware of the experiment, criticized the removal of the refund option:

> I placed an order and one of the items I received was damaged. I went through the standard "request help" flow, and noticed that I can no longer receive a CC [credit card] refund, just an IC [Instacart] credit. Usually, retailers will offer you a CC refund in the case of an item refund – only getting an IC credit feels insufficient, and for someone who has a larger issue and is more financially constrained – for example, they paid with a debit card, but now have to go buy the item elsewhere – this approach could be financially burdensome. It seems reasonable to ensure that item refunds can always be done to the initial payment method, whereas more general appeasements be provided as credits towards a future purchase.

46.    Despite knowing that the revised reporting flow deceived many consumers about the availability of refunds, Instacart deemed the experiment a success. Instacart found that consumers who saw the revised flow accepted credits more often than consumers who were presented with a direct refund option. It also found that consumers who saw the revised flow were more likely to place subsequent orders, although those orders were smaller than average. That finding suggests that some consumers who would have preferred refunds accepted the credits offered and then placed additional orders solely to use up the credit (creating more revenue for Instacart). Instacart also found that consumers who saw the revised flow reported fewer order issues overall (i.e., submitted fewer total requests for refunds or credits)—suggesting that some consumers who were disinclined to use Instacart again did not even bother to accept the credits offered when no obvious refund option was presented. Instacart estimated in July 2022 that removing the refund option from the self-service issue reporting flow would significantly increase retention among new users and save Instacart approximately $289,000 per week.

47.    The "success" of the experiment led Instacart to permanently hide the refund option on its self-service reporting flow. Now, consumers who use the self-service option to report a missing or damaged item see only an option for a credit, with an icon below for the "Help Center":

1    **Figure 9.**



48.    Consumers who press on the "Help Center" icon on this screen are shown another screen, which presents various options for seeking help but does not mention refunds (*see* Figure 10). If consumers click on the "Connect with Instacart" button on this screen, they are connected via chat to Instacart's virtual assistant (*see* Figure 11). The virtual assistant chatbot does not immediately present a refund option; rather, consumers must affirmatively communicate that they want a refund.

**Figure 10.**



**Figure 11.**



49. By hiding the refund option from its self-service reporting tool, Instacart has misled consumers into believing that they are not eligible for refunds when they have problems with their orders, despite Instacart's 100% satisfaction guarantee, causing harm to consumers who prefer refunds to credits.

### **Instacart's Unlawful Negative Option Enrollment Practices for Instacart+**

### **Instacart Uses Free Trials to Lure Consumers into Paid Instacart+ Memberships**

50. Instacart offers a subscription membership service called Instacart+, formerly known as Instacart Express (hereinafter, "Instacart+").

51. Consumers who join Instacart+ receive certain benefits that are not routinely offered to nonmembers. These benefits have varied over time, but the primary benefit has always been $0 delivery fees (which Instacart frequently advertises as "free delivery") on orders over a certain

amount. Currently, Instacart+ members pay $0 delivery fees on orders of $10 or greater at most retailers; previously, the threshold was $35.

52.     Instacart charges most consumers $99 per year for an annual Instacart+ membership. It also offers monthly memberships for $9.99 per month. Most Instacart+ memberships automatically renew for the next membership term (year or month) unless the consumer affirmatively acts to stop the automatic renewal.

53.     To entice consumers to try out an Instacart+ membership, Instacart regularly offers free trials of Instacart+. From December 2020 through September 2024, Instacart enrolled consumers in over 30 million free trials of Instacart+.

54.     Although consumers can sign up directly for a paid annual or monthly Instacart+ membership, the vast majority of consumers become Instacart+ members through free trial promotions that automatically renew into paid subscriptions.

55.     The most common free trial promotion offered by Instacart is a 14-day free trial that automatically renews into a paid annual subscription unless the consumer affirmatively cancels the automatic renewal or elects to renew into a monthly subscription instead.

56.     Instacart advertises free trials of Instacart+ through various means, including banner ads and similar placements prominently displayed throughout its website or mobile apps. Figure 12 shows an example of a free trial promotion displayed as a banner at the top of the shopping page on the Instacart website.

**Figure 12.**



57.     And Figure 13 shows an example of a free trial promotion displayed near the bottom of the shopping cart interface.

**Figure 13.**



**Instacart Fails to Clearly and Conspicuously Disclose All Material Terms**

**Before Enrolling Consumers in Instacart+**

58.    Consumers who click on these free trial promotions are shown an Instacart+ "upsell" screen (typically rendered as a pop-up window) that contains a button the consumer can press or click on to enroll in the free trial. (*See* Figure 14.)

**Figure 14.**

59.     The typical Instacart+ upsell screen features a header image with an Instacart+ logo at the top, followed by a headline (e.g., "Join Instacart+ for free delivery and more"). Below the headline is a bullet-point-style list of certain benefits or features of Instacart+ membership. Below that list is a button that consumers can press or click on to start the free trial (a "call-to-action" button). And below the call-to-action button, in fine print, is a paragraph describing additional terms applicable to the free trial.

**Figure 15.**



**instacart+**

### Get unlimited free delivery for 2 weeks

 **$0 delivery fee**
On orders over $35

 **5% credit back**
On eligible pickup orders

 **Lower service fees**
On all orders

 **Peacock**
Hit movies, TV, live sports, and more ($59.99/yr value)

 **$99/yr after trial**
Cancel anytime

**Try free for 2 weeks**

No thanks

By signing up, you agree to the Instacart+ Terms and authorize a charge of $99/year to be billed automatically to any active card on file after your free trial ends. Cancel in your account settings. Other taxes, fees, and/or tips may apply. Additional Instacart+ benefits are subject to additional terms. Instacart may modify or terminate

60.     Consumers who do not want to start a free trial of Instacart+ must close the upsell screen, either by pressing or clicking on an "x" on the top left corner of the pop-up (*see* Figures 14, 16) or by pressing or clicking on text below the call-to-action button that says "No Thanks" or something similar (*see* Figure 15), depending on which option is displayed.

61.     In many instances, Instacart displays an Instacart+ upsell screen to consumers automatically, even when they did not press or click on a free trial promotion. For example, Figure 15 shows an upsell screen that was displayed when consumers first create an Instacart account.

62.     In many versions of the upsell screen, Instacart displays the text "$99/yr after trial" as the last of the bullet-point items above the call-to-action button, often paired with the phrase, "Cancel anytime." (*See* Figures 14-15.) But in many instances, consumers using Instacart's mobile apps do not see this language unless they scroll down the screen, which they are not required to do to enroll in the free trial. (*See* Figure 16.)

**Figure 16.**









---

63.     In most instances, there is nothing displayed on the upsell screen above the call-to-action button that clearly discloses the fact that consumers will be enrolled in a paid Instacart+ membership and charged a fee after their trial ends. And in most instances the only disclosure that consumers will be charged for Instacart+ is in the fine print below the call-to-action button. Among other things, the fine print states that by signing up for a free trial of Instacart+, the consumer is authorizing Instacart to charge an active payment method on file after the free trial. In many instances the fine print says nothing about the amount of this charge.

64.     Instacart does not require consumers to read the fine print displayed below the call-to-action button before enrolling in a free trial. In some instances, consumers may not even see all the fine print unless they scroll down. (*See* Figure 15.)

65.     In most instances, there is no information presented anywhere on the upsell screen that details how or when Instacart will charge consumers for a paid membership. Specifically, in most instances the upsell screen does not tell consumers that they will in fact be charged $99 for a full year of membership shortly after their free trial ends.

66.     Additionally, in most instances, the upsell screen does not tell consumers that they are enrolling in a paid membership that will automatically renew each year unless canceled.

67.     In most instances, Instacart tells consumers in the upsell screen that they can "cancel" an Instacart+ membership "anytime." But the upsell screen does not tell consumers that if they cancel, they are entitled to a refund only if (a) they cancel within 5 days after their paid membership term begins and (b) they have not placed any orders using their paid Instacart+ membership. Nor does the upsell screen explain that if consumers "cancel" their membership at any other time, the only thing they are "cancelling" is the automatic renewal into the next paid membership term.

68.     In most instances, the only way consumers could learn about these terms from the upsell screen is if they pressed or clicked on the hyperlink labeled "Instacart+ Terms" in the fine print below the call-to-action button. That link opens a web page displaying several paragraphs of terms and conditions applicable to Instacart+. In many instances, consumers must scroll down the page multiple times to fully read all of these terms (*see* Figure 17 below).

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF

**Figure 17.**

### 3. Instacart+

Instacart+ (formerly Instacart Express) is a membership program that waives the delivery fee and reduces certain service fees for scheduled deliveries on orders $35 or over (the "Instacart+ Benefits") with each Retailer placed through the Services for a monthly or yearly subscription fee. Instacart+ Benefits may differ on certain Retailers' white label sites that are powered by Instacart, where available. You acknowledge that your Instacart+ membership does not entitle you to faster delivery times or guaranteed or priority time slots. Service fees (including additional fees and surcharges to help offset specific costs), priority fees, direct-to-consumer shipping fees, long distance fees, alcohol service fees, heavy order fees, special handling fees, taxes and/or tips may still apply. For combinations with other offers, restrictions may apply. Prescription drug delivery services through Instacart Rx are not eligible for Instacart+ membership benefits.

UNLESS YOU CANCEL, BY DEFAULT (AND WITH PRIOR NOTICE TO THE EXTENT REQUIRED BY APPLICABLE LAW), YOUR INSTACART+
MEMBERSHIP WILL AUTOMATICALLY RENEW

  

69.     To find out what terms apply to a free trial of Instacart+, consumers would have to read all the way down to the fifth paragraph of the Instacart+ Terms. In the middle of that paragraph, Instacart discloses, "At the end of your free trial period or promotional membership period, Instacart will automatically charge you the applicable Instacart+ subscription fee to the payment method on file with Instacart. If you cancel your Instacart+ membership before the free trial or promotional membership has expired, Instacart will not charge you for the subsequent Instacart+ membership term unless you restart your membership."

70.     The second paragraph of the Instacart+ Terms includes a disclosure in uppercase letters informing consumers that by default, unless they cancel, their Instacart+ membership will automatically renew for the next annual or monthly term and that the membership fee will be automatically charged to a payment method on file at the time of renewal.

71.    The fourth paragraph of the Instacart+ Terms describes the cancellation and refund policy as follows:

> You may cancel your membership within the first five (5) calendar days of your paid annual membership term or renewed annual subscription, and receive a refund of the Instacart+ membership fee you paid, but only if you have not placed any orders using your Instacart+ membership. When you cancel a monthly membership or if you cancel at any other time, you will not receive a refund, but you can continue to enjoy the benefits of your Instacart+ membership through the end of your paid membership term.

Before August 15, 2023, Instacart provided a 15-day window to receive a refund instead of 5 days, and it applied this window to both monthly and annual memberships.

72.    Instacart does not require consumers to click on the hyperlink to the Instacart+ Terms or to otherwise read those terms before enrolling in a free trial via the upsell screen.

73.    Consumers who press or click on the call-to-action button in the upsell screen are immediately enrolled in a free trial of Instacart+ with a default automatic renewal into a recurring, paid annual subscription. In many instances, consumers are then shown a "welcome" screen that does not reference the fact that consumers will be charged for a paid subscription after their free trial ends (*see* Figure 18 below). Instacart does not require consumers to take any additional affirmative steps before charging them for an annual subscription after their free trial ends.

74.    In fact, it is only *after* consumers are enrolled in the free trial that Instacart sends consumers additional information—in the form of a "welcome" email—explaining when and how they will be charged for an Instacart+ membership after the free trial ends. Instacart also sends reminder emails to consumers before their free trials expire (typically either 3 days or 7 days before the trial end date), although some consumers did not receive reminder emails. These post-enrollment emails typically include language stating that the consumer "can cancel any time," but they do not disclose the terms of Instacart's refund policy. Instacart also sends emails to consumers after they are charged for a paid Instacart+ membership. However, if consumers do not receive or do not read these emails for any reason, they may not learn that they have been charged for an annual Instacart+ membership fee until after they review their credit or debit card statement (or similar statement based on their method of payment).

**Figure 18.**



75.    Consumers typically do not see information about their free trial and its automatic renewal into a paid membership while browsing on the Instacart website or mobile apps unless they go into their account settings and select the page relating to Instacart+. At the top of this Instacart+ account settings page, Instacart displays the number of days remaining in the consumer's free trial without referencing the automatic renewal into a paid subscription. At the bottom of the page, there is a "Manage your membership" section where the consumer can request a reminder email before renewal, change their plan from annual to monthly, or cancel their membership. In some instances, information relating to the renewal, such as "Payment starts on" date and "Renews into annual plan ($99/year)," is displayed in light gray text (against a white background) that is much lower contrast than the black or green text used elsewhere on the page. (*See* Figure 19 below.)

**Figure 19.**



76.    When consumers enroll directly in an Instacart+ membership without a free trial promotion, they typically see upsell screens that are similar to those used for free trials. However, these upsell screens usually give consumers a choice of whether they want to enroll in an annual or monthly plan. In many instances, these upsell screens inform consumers that they can "cancel anytime," but they do not disclose the terms of Instacart's refund policy. Additionally, in many instances these upsell screens do not clearly disclose that the membership will automatically renew after the first year of paid membership.

**Consumers Are Deceived by the Instacart+ Enrollment Process**

77.    Many consumers have complained that Instacart charged them for an annual Instacart+ subscription without their consent. Among other things, many consumers have complained that they did not know that they were signing up for a paid Instacart+ membership when they signed up for a free trial.

78.     Instacart is aware that many consumers do not realize they are signing up for a paid Instacart+ membership when they enroll in a free trial. When Instacart tested a similar version of its free trial upsell screen for Instacart Express in 2021, it found that half of the users in the study did not notice they had just enrolled in an Express membership, noting that "[s]ome users may read 'Start 14-day trial' as an enrollment in the 14-day trial, and not the full Express membership."

79.     In October 2021, when Instacart began specially training customer service agents on retention efforts for Instacart Express members seeking to cancel, early reports indicated that "nearly ¼ of customers contacted [customer service] because they noticed an 'unknown charge' and [were] cancelling due to cost," while 17% of customers "didn't know the free trial is auto-renewed and they placed 1 or less orders using Express since it is auto-renewed."

80.     When Instacart was considering changes to its membership program to rebrand it as Instacart+, one employee advised against changing the 15-day window for refunds after free trials, writing:

> We also do not recommend playing with the "grace period" given we believe it's the right thing to do for our users, who often seem unaware that they are renewing into a $99 plan. . . . Tightening this policy would result in a drastic increase in complaints and Care contacts, and could also increase the likelihood of legal issues. In short, we do not believe that worsening the experience for users who we just charged $99 – often when they were unaware that they were going to be charged – is the way we want to drive growth.

81.     In April 2023, Instacart determined that 65% of its weekly Instacart+ cancellations came from users who were automatically renewed into a paid plan from a free trial, representing around 23,000 subscribers per week, and the majority of those users had just converted from their first trial after placing no orders during the trial. Reviewing these statistics, an Instacart researcher wrote, "This is a huge proportion of cancels, and I think a decent proxy measure of how many customers don't realize they joined IC+, didn't know the trial converts to a paid membership, or wanted to cancel but didn't have a chance to." The same researcher further wrote, "we also know awareness and understanding of trial conversion and auto-renew status is low."

82.     Although some consumers realize they have been signed up for a paid Instacart+ membership and timely cancel their free trials or get refunds under the terms of Instacart's policy,

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF

1    many other consumers do not and do not receive refunds. Hundreds of thousands of consumers did

2    not receive refunds despite placing zero orders after being charged for a membership.

3         83.    Additionally, many consumers have complained that Instacart's "cancel anytime"

4    representations are deceptive. For example:

5              a.    "Buyer beware – when Instacart says you can cancel your membership any

6                    time, they mean only when the annual membership ends. You do not get any

7                    cancelation / refunds for the remainder portion of your membership."

8              b.    "I never knew Insta[cart] charged $107 at one time for being a member and

9                    also I thought I could cancel anytime which you can't."

10             c.    "Signed up for a years contract, the site promised, 'you can cancel anytime.' I

11                    was dissatisfied with the service after using several times. Poor quality and

12                    very inconsistent. I went online to cancel, they stated no refund, and the

13                    'cancel anytime' applied to canceling next year (April 2021) contract. The

14                    information was misrepresented. I should get a prorated refund. They did not

15                    indicate this was not available when I signed up. Deceptive practice. Please

16                    help."

17        84.    Based on the facts and violations of law alleged in this Complaint, the FTC has

18   reason to believe that Defendant is violating or is about to violate laws enforced by the Commission

19   because, among other things: Defendant engaged in its unlawful acts and practices repeatedly over a

20   period of several years; Defendant earns millions of dollars each year from participating in these

21   unlawful acts and practices; and Defendant continued its unlawful acts or practices despite

22   knowledge of numerous complaints.

23                              **VIOLATIONS OF THE FTC ACT**

24        85.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or

25   practices in or affecting commerce."

26        86.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or

27   practices prohibited by Section 5(a) of the FTC Act.

28

**Count I**

**Misrepresentations Regarding Free Delivery**

87.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of goods and delivery services through the Instacart Marketplace, Defendant represents, directly or indirectly, expressly or by implication, that consumers will receive free delivery of goods purchased through the Instacart Marketplace.

88.     Defendant's representations as described in Paragraph 87 are false or misleading. In fact, consumers cannot receive delivery of goods purchased through the Instacart Marketplace without being charged additional fees.

89.     Therefore, Defendant's representations constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**

**Deceptive 100% Satisfaction Guarantee**

90.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of goods and delivery services through the Instacart Marketplace, Defendant represents, directly or indirectly, expressly or by implication, that consumers can receive a refund if they are not 100% satisfied with their purchase on the Instacart Marketplace.

91.     In fact, in numerous instances in which Defendant has made the representations described in Paragraph 90, consumers cannot receive a refund if they are not 100% satisfied with their purchase.

92.     Therefore, Defendant's representations are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III**

**Failure to Disclose Refund Option**

93.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of goods and delivery services through the Instacart Marketplace, Defendant represents, directly or indirectly, expressly or by implication, that consumers can receive a refund if they are not 100% satisfied with their purchase on the Instacart Marketplace.

94.     In numerous instances in which Defendant has made the representation described in Paragraph 93, Defendant fails to disclose or fails to adequately disclose that consumers can receive a refund by contacting customer service. This additional information would be material to consumers in deciding whether to accept a credit instead of requesting a refund.

95.     In light of the representations described in Paragraph 93, Defendant's failure to disclose or disclose adequately the material information as described in Paragraph 94 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

96.     In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-04, which became effective on December 29, 2010. In passing ROSCA, Congress declared that "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401(2).

97.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the person: (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before making the charge; and (3) provides simple mechanisms for a consumer to stop recurring charges. *See* 15 U.S.C. § 8403.

98.     The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

99.     As described in Paragraphs 50 to 83 above, Defendant has advertised and sold subscription services through a negative option feature as defined by the TSR. 16 C.F.R. § 310.2(w).

100.    Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV

### Violation of ROSCA—Failure to Clearly and Conspicuously Disclose Material Terms

101.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 50 to 83 above, Defendant has failed to clearly and conspicuously disclose all material terms of the transaction before obtaining consumers' billing information, including: that consumers are being enrolled in an automatically renewing paid subscription, when consumers will be charged, and the terms under which consumers may receive refunds.

102.    Defendant's acts or practices as described in Paragraph 101 are violations of Section 4 of ROSCA, 15 U.S.C. § 8403.

## Count V

### Violation of ROSCA—Failure to Obtain Express Informed Consent Before Charges

103.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 50 to 83 above, Defendant has failed to obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction.

104.    Defendant's acts or practices as described in Paragraph 103 are violations of Section 4 of ROSCA, 15 U.S.C. § 8403.

## CONSUMER INJURY

105.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and ROSCA. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRAYER FOR RELIEF**

Wherefore, the FTC requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA;

B.      Award monetary and other relief within the Court's power to grant; and

C.      Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: December 18, 2025

/s/ Alan Bakowski
ALAN BAKOWSKI
HANS CLAUSEN
CHRISTOPHER GLEASON
Federal Trade Commission
401 W. Peachtree Street, NW, Suite 1500
Atlanta, Georgia 30308
(404) 656-1363; abakowski@ftc.gov
(404) 656-1361; hclausen@ftc.gov
(404) 656-1352; cgleason@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION